In the trial of one accused of larceny after trust, the evidence, to warrant a conviction, must prove the trust as laid. The conversion of property which was temporarily loaned to another for his own use, and not for the use or benefit of the owner or some other person, is not a breach of such an entrustment as will support a conviction of larceny after trust.
 DECIDED MAY 12, 1949.
The defendant was convicted of larceny after trust. Omitting the formal parts, the indictment alleged: "In the name and behalf of the citizens of Georgia, charge and accuse Floyd Silvers with the offense of larceny after trust. For that the said Floyd Silvers on the 12th day of April, in the year 1947, in the county aforesaid, did then and there, unlawfully and with force and arms, after having been entrusted by W. M. Hammond, the owner, with the 1941 model 1-1/2 ton Chevrolet truck for the purpose of hauling lumber with said truck, did falsely and fraudulently convert said truck to his own use and did otherwise dispose of same without the consent of the said Hammond, and did thereby injure and damage said Hammond in the sum of $500, the reasonable value of said truck to the injury and damage of said Hammond in said sum." He filed his amended motion for a new trial, and assigns error on the overruling of his motion. The prosecutor, W. M. Hammond, testified in part: He let the defendant have a 1941-model 1-1/2 ton Chevrolet truck, together with a little sawmill and a tractor. The timber the defendant was cutting was on his brother's place. The witness told the defendant that, when he finished cutting the timber, the witness wanted the mill and tractor brought down to Plainsville. *Page 224 
This was about the middle of the week. The following Monday the witness went to the mill site and the tractor was gone. He looked for the defendant and the defendant was gone. He never did find him. He never did find the 1941 1-1/2-ton truck. It was gone. "This truck that I let him have — as to whether or not I just let him have it to finish cutting that stand of timber: well, he had been using it and I just let him keep it on up there until he got through. I have not gotten that truck back. As to when I ever saw Mr. Silvers again, well, I have never talked with him about it, I didn't see him any more from the day I was up there and talked to him until he was here at the last term of court. I don't know where he was in the meantime. I do not know where he was any of that time." On cross-examination, the same witness testified: "I said a while ago that Floyd Silvers asked me for my truck and tractor to take up above Red Bud to cut some timber, and I allowed him to take the truck and the tractor up there to cut some timber. He was going to sell the lumber to me. No, he didn't sell the lumber to me. As to whether or not I refused to buy it, well I went up there and he wanted me to pay him for about twice as much as he had cut, and he said he couldn't come out. I believe it was $35 he was going to get for it. At that time I was selling lumber for about $37 or $38, so I told him he could just go ahead and make other arrangements and sell it somewhere else; he said he had a place where he could get more money for it.Yes, I just loaned Floyd my truck and mill to go up there andcut that timber, and all the time that he had the truck and thesawmill up there he was using it for himself." (Italics ours.) With the evidence of this witness in, the State rested its case.
The defendant put in evidence the testimony of Charlie Patterson, who testified substantially that he was present when the prosecutor Hammond sold the truck in question to the defendant for $1000, on credit. The defendant then made a statement as follows: "I was living on lawyer Lang's place cutting timber for Cliff King, and Mr. Hammond came over after me. He was cutting this windmill, that oak stuff down in the pasture. He kept on until I went down there and I had a jeep then. I had bought it from Cliff King. Well, he wanted me to move *Page 225 
over there to Scottsville, and I moved over there in one of his brother's houses, and stayed over there and drove my jeep backwards and forwards and hauled his men in the jeep, some of them back and forth to work as long as I kept it. And he wanted to sell me the truck, and that is when I bought the truck. While I lived over there I hauled one set, one bit set of his logs and the next set, I cut it and we logged it, and when we went to settle up I had $50 coming on this set, and he took the $50 on what I owed him and put it on the books, the ones I told him to bring in, and he knows that he put it on the books. I was standing right there when he did it. I went on up here then, and I had bought the sawmill from him and moved it up yonder to cut some timber. And I was going to sell him the lumber and I went down there for a pay day. I went down there and he wasn't there. Mr. Hammond was there, and I never got no pay day, and I told him I would have to pay my men. I went back to my brother's and came on back and the next morning I came up here to Mr. Morgan's and he sold the timber for $40 a thousand, and he wanted to give me $35 and me deliver it. And I sold it at $40 up there, and when he did that and he came up there then and he stood down there and he never did tell me to bring the mill or nothing home; he sure enough never told me to bring not one thing home. He sold it to me fair and square and the books, if he would bring in the books, he knows just what I am telling you right now. And that is all I have got to say about it."
After this statement, the prosecutor Hammond was recalled and testified: "I heard the defendant's statement, and I also heard Mr. Patterson's testimony. I positively did not ever sell this 1941 Chevrolet 1 1/2-ton truck to Mr. Silvers. As to whether or not anything was ever said about him buying it from me or me selling it to him, well, he mentioned he wanted to buy it a time or two, but I told him I didn't want to sell it, but I would lethim use it. I know Charlie Patterson. As to whether or not he ever worked for me, well, he worked for me two or three days. He worked for Mr. Silvers a pretty good while. As to whether or not Mr. Patterson was present at any time when I had *Page 226 
a conversation with Mr. Silvers or he had one with me, when Silvers wanted to buy the truck, well, he wasn't, and he wasn't even around the day that I told him, I had the truck in Rome putting a new motor in it, and that was the day I told him thathe could use it when I got the truck out of the shop, but Patterson wasn't even around. I did not sell Mr. Silvers a sawmill. As to whether or not I ever got my sawmill back, well, I got the sawmill back. He sold the tractor when he left. Yes, the tractor was a part of the sawmill, the power unit, you pull the sawmill with this tractor. I did not ever sell him the sawmill with the tractor as part of it. I got it back. I got the sawmill up there where he sawed that lumber. He had sold the tractor to Mr. McAfee, and Mr. McAfee let me have the tractor back. I never got my truck back and never did find it. I don't know where it is today." (Italics ours).
The indictment was drawn under the Code, § 26-2809, which reads in part: "Any person who has been intrusted by another with money, note, bill of exchange, bond, check, draft, order for the payment of money, cotton, or other produce, or any other article or thing of value, for the purpose of applying the same for the use or benefit of the owner or person delivering it, who shall fraudulently convert the same to his own use, shall be punished by imprisonment and labor in the penitentiary for not less than one year nor more than five years." While there was no demurrer to the indictment, it will be noted that it is nowhere alleged therein that the truck in question was entrusted to the defendant for the use and benefit of the owner Hammond, in accordance with the provisions of law in that statute. The indictment alleges that the truck was entrusted by the owner to the defendant for the purpose of "hauling lumber." The indictment nowhere alleges for whom the lumber was to be hauled. The State's evidence shows that the truck was loaned to the defendant to be used by the defendant for himself "to cut some timber." The evidence fails to show that the truck was used to haul lumber. The evidence shows that it was used for cutting timber and not for hauling lumber. Therefore we think that the verdict can not stand for *Page 227 
two reasons: In the first place, the evidence is at variance with the allegations of the indictment. In McNish v. State,88 Ga. 499, 500 (14 S.E. 865), the Supreme Court said: "The indictment being for larceny after a trust had been delegated, in order to convict the accused, it was necessary to prove the creation of the trust described in the indictment, and a fraudulent breach of it in the manner alleged. To charge one trust and prove another would not suffice." See also Clack v.State, 47 Ga. App. 323, 325 (170 S.E. 398). In the second place, the evidence shows that the prosecutor himself several times testified that he temporarily loaned the truck to the defendant. In Davis v. State, 38 Ga. App. 206 (1, 2) (143 S.E. 435), this court said: "A mere temporary loan of property, without hire or other benefit to the person lending, is not such a fiduciary bailment as would make the stealing or conversion of the property larceny after trust. Barksdale v. State, 28 Ga. App. 535
(112 S.E. 165). . . Under the above-stated ruling and the facts of the instant case, the defendant's conviction of larceny after trust was unauthorized, and the refusal to grant him a new trial was error." See also Rice v. State, 6 Ga. App. 160
(2) (64 S.E. 575).
The other assignments of error are without merit.
Judgment reversed. MacIntyre, P. J., and Townsend, J., concur.